## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **REGIONS BANK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:14-CV-03607** |
| | § | |
| **COMERICA BANK,** | § | |
| | § | |
| **Defendant.** | § | |

## REGIONS BANK'S ORIGINAL COMPLAINT
## FOR DECLARATORY JUDGMENT

Regions Bank files its Original Complaint for Declaratory Judgment against Defendant Comerica Bank and, in support thereof, would show the Court as follows:

## INTRODUCTION

1.      For months, Comerica Bank has threatened litigation against Regions Bank in connection with a failed $52.5 million syndicated loan facility that the parties provided to a now-bankrupt group of greenhouse operators (collectively, "Borrowers).  Borrowers, together with their agents, induced Regions Bank and Comerica Bank to make this loan by orchestrating a massive accounting fraud that improperly inflated the company's financial statements and misled the banks into believing that the company could repay the loan. In fact, Borrowers never could have repaid the loan in light of their true financial condition and, within months of closing, they defaulted on the $52.5 million loan facility.

2.      Comerica Bank, during its discussions with Regions Bank, has contended that Regions Bank has liability to Comerica Bank for allegedly failing to inform Comerica Bank about certain information related to the Borrowers' financial condition.

3.      Regions Bank acted as Administrative Agent for the syndicated loan. The credit agreement governing the syndicated loan accordingly gave Regions Bank certain administrative

responsibilities. The agreement also exculpated Regions Bank from liability for making or not making representations to Comerica Bank about Borrowers' creditworthiness or the accuracy of information that Borrowers provided to the lenders. For its part, Comerica Bank repeatedly and specifically disclaimed reliance throughout the diligence period leading up to closing. As is customary in the syndicated loan space, Comerica Bank and Regions Bank explicitly agreed to rely solely on their own efforts in investigating the borrowers' financial condition and underwriting the loan.

4.      Regions Bank therefore seeks a declaration from this Court that Comerica Bank has no claim against Regions Bank for at least three independent reasons. **First**, as a matter of contract, Comerica Bank conclusively disclaimed any right to rely on Regions Bank's statements or omissions when Comerica Bank executed the credit agreement. **Second**, as a further matter of contract, Regions Bank owed no duty to Comerica Bank to verify the adequacy of Borrowers' representations or any documents tendered by Borrowers, and Comerica Bank affirmatively agreed that Borrowers' representations and documents were satisfactory to Comerica Bank. **Third**, as a matter of law, Comerica Bank's threatened claims against Regions Bank are barred by the doctrines of *res judicata* and collateral estoppel based on the orders entered by the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division, in connection with Borrowers' Chapter 11 bankruptcy case.

## PARTIES

5.      Regions Bank is a state-chartered bank formed under the laws of Alabama, and maintains its principal place of business in Birmingham, Alabama. For purposes of diversity jurisdiction, Regions Bank has its principal place of business in, and is a citizen of, Alabama.

6.      Comerica Bank is a Texas state-chartered bank that maintains its principal place of business in Dallas, Texas. For purposes of diversity jurisdiction, Comerica Bank has its principal place of business in, and is a citizen of, Texas.

## JURISDICTION & VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy in this action exceeds $75,000 (excluding interest and costs), and complete diversity of citizenship exists between the parties.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant Comerica Bank resides within this judicial district and is a resident of Texas.

9.      This Court has personal jurisdiction over Comerica Bank because it is a citizen of the State of Texas, and because it has systematically and purposefully availed itself of the benefits and protections of the laws of the State of Texas such that it could reasonably anticipate being hailed into a Texas court.

## FACTUAL BACKGROUND

10.      This litigation arises out of a syndicated loan transaction whereby Regions Bank and Comerica Bank loaned approximately $52.5 million to Borrowers, a now-bankrupt group of agricultural companies, pursuant to a Credit Agreement dated November 15, 2012, which is attached as **Exhibit A** (the "Credit Agreement"). Regions Bank and Comerica Bank each conducted months of extensive due diligence before agreeing to loan money to Borrowers, including performing site visits, extensively reviewing Borrowers' financial documentation, and communicating at length with Borrowers and their agents.

11.      Despite the banks' efforts, Borrowers and their agents successfully committed a massive accounting fraud whereby they concealed a vast overstatement of their inventory and profits. Borrowers were aided in this fraud by their financial advisors, their accounting firm, their

outside counsel, and others. Both Regions Bank and Comerica Bank have sued these fraudfeasors in Texas state court. As between Regions Bank and Comerica Bank, however, there is no dispute that the Borrowers and their agents defrauded the banks.

12.     Regions Bank and, upon information and belief, Comerica Bank were both unaware of Borrowers' fraud when, on November 15, 2012, they executed the Credit Agreement establishing a $52.5 million senior secured, term and revolving loan facility to Borrowers.[1] Under the terms of the Credit Agreement, Regions Bank provided two-thirds of all advanced loan funds, while Comerica Bank provided one-third. The next several months revealed the Borrowers' actual financial situation. Borrowers repeatedly defaulted under the terms of the Credit Agreement, failed to make required payments, and ultimately filed for Chapter 11 bankruptcy.

13.     Dating back to November, 2013, Comerica Bank has repeatedly threatened to sue Regions Bank, accusing it of concealing and misrepresenting information about Borrowers' financial status. Of course, had Regions Bank known the truth about Borrowers' dismal financial situation, Regions Bank, itself, never would have entered into the Credit Agreement.  Regions Bank lost tens of millions of dollars based on Borrowers' fraud; Comerica Bank's losses were far less. Borrowers' misrepresentations to both banks caused Comerica Bank's losses—not any misstatement or omission that Regions Bank allegedly made.

### THE COLOR STAR SYNDICATED LOAN FACILITY

#### *Comerica Bank: A Sophisticated Financial Institution*

14.     Comerica Bank prides itself on performing independent and thorough due diligence rather than relying on the analysis of others. As stated in its 2013 10-K Annual Report, Comerica recognizes that its "loan portfolio is a primary source of profitability and risk, so proper loan underwriting is critical to Comerica's long-term financial success. Comerica extends credit to

---

[1] On the same date, another lender also extended a $15 million junior debt secured term loan to Borrowers, for a total loaned amount of $67.5 million.

businesses, individuals and public entities based on sound lending principles and consistent with prudent banking practice." Additionally, Comerica Bank assures its investors of its sound underwriting practices and promises, "[d]uring the loan underwriting process, a qualitative and quantitative analysis of potential credit facilities is performed, and the credit risks associated with each relationship are evaluated."

### The Borrowers: Agricultural Businesses on the Brink

15.     Prior to the bankruptcy that followed the events described in this Complaint, the Verbeek family owned an affiliated group of greenhouse operators known as Color Star Growers of Colorado, Inc., Color Star L.L.C., and Vast, Inc. Borrowers operated greenhouses and plant nurseries in Colorado, Missouri, and Texas. Borrowers grew a variety of indoor and outdoor plants for retail sale, including annuals, perennials, herbs, and seasonal specialty plants such as Easter Lilies, Poinsettias, and Mums. The Borrowers' major clients included Lowe's and Wal-Mart. The Borrowers held themselves out as the sixth-largest retail plant greenhouse operator in the United States.

16.     The value of Borrowers' inventory was a critical component of Borrowers' financial condition. Not only did Borrowers' inventory represent a significant portion of their available collateral, but also Borrowers' inventory value (and the related "cost of goods sold"), which directly affected its earnings, profits, and equity.   An overstatement of inventory necessarily inflated Borrowers' apparent earnings and profits, as well as the amount it could borrow under the revolving portion of its loan facility.

17.     Because Borrowers operated greenhouses, their inventory consisted principally of ready-for-sale plants, seedlings, and raw materials, which made ongoing inventory tracking difficult. Consequently, Borrowers did not have a perpetual inventory management and tracking system. Instead, Borrowers confirmed their inventory by doing semiannual physical inventory counts as of

June 30 and December 31 each year. Borrowers' accounting firm (the "Accountants") annually supervised one or both of these inventory counts.

18.     Leading up to the fall of 2012, Borrowers had borrowed millions of dollars from a bank syndicate led by Bank of the West. On information and belief, as those loans approached maturity, Bank of the West told Borrowers that it would not renew Borrowers' loans beyond 2012. As a result, Borrowers needed alternative financing to continue operating. Without financing, Borrowers would have failed within weeks. Desperate for replacement financing, Borrowers turned to financial advisors (the "Financial Advisor"), who represented Borrowers in their attempt to secure financing.

### August 2012 through November 2012: Comerica Bank Conducts its Own Independent Due Diligence, and Disclaims Reliance on Regions Bank.

19.     In an effort to refinance their debt to Bank of the West, and to avoid both a maturity default and the ensuing business failure, Borrowers approached Regions Bank in the spring of 2012. By August 2, 2012, Borrowers and Regions Bank had agreed to a term sheet for a $55 million loan—later reduced to $52.5 million.

20.     The term sheet did not constitute a loan agreement; closing of the proposed loan transaction required additional steps, such as syndicating the loan.  During the summer of 2012, Comerica Bank and other lenders expressed interest in the loan syndication.

21.     Comerica Bank, as well as Regions Bank, then conducted extensive due diligence on Borrowers' financial condition from August 2012 to November 2012, when the parties ultimately closed the loan transaction and executed the Credit Agreement. During this diligence period, Borrowers provided to Regions Bank and Comerica Bank numerous audited and unaudited financial statements, balance sheets, projections, reports, and other information regarding, *inter alia*, the purported but false value of Borrowers' inventory from 2007 through 2012.

22.     As is customary among lenders in syndicated loan transactions, each potential lender agreed to rely solely on its own due diligence, and expressly disclaimed all reliance on any of the other potential lenders, including Regions Bank. In this case, Comerica Bank repeatedly and expressly disclaimed reliance on Regions Bank's diligence, representations, or lack of representations throughout the process of evaluating Borrowers' financial condition.

23.     Most, if not all, of Borrowers' financial information was received by Regions Bank from the Borrowers or their agents and then either forwarded directly to Comerica Bank or uploaded into an electronic database called Debtdomain, to which Comerica Bank had access.

24.     Comerica Bank accessed the Debtdomain database from at least August 27, 2012, through November 2012. As a condition of accessing the Debtdomain information (called the "Evaluation Material") Comerica Bank was required to, and did, affirmatively agree that it would not rely on Regions Bank to verify or correct an inaccuracy or incompleteness in the Debtdomain documents and information. Specifically, Comerica agreed that:

> [Comerica Bank] underst[ood] and agree[d] that [Regions Bank] received the Evaluation Material from third party sources (including the Company) and that we bear **no responsibility (and shall not be liable) for the accuracy or completeness (or lack thereof) of such Evaluation Material or any information contained therein**. . . .

> This agreement embodies the entire understanding and agreement between the parties with respect to the Evaluation Material and supersedes all prior understandings and agreement relating thereto. . . .

(emphasis added).

25.     Once Comerica Bank accessed the Debtdomain information—which housed all of the Borrowers' financial statements and other information in which Borrowers misrepresented the value of their inventory—Comerica Bank also received a "Transaction Summary" that cautioned again that Regions Bank made no representations about the validity of the Borrowers' information

or the quality of the proposed syndicated loan transaction. In particular, Comerica Bank understood

that:

> The Evaluation Material has been prepared to assist interested parties in making their own evaluation of the [Borrowers] and the Senior Credit Facilities and does not purport to be all-inclusive or to contain all of the information that a prospective participant may consider material or desirable in making its decision to become a lender. **Each Recipient of the information and data contained herein should take such steps as it deems necessary to assure that it has the information it considers material or desirable in making its decision to become a lender and should perform its own independent investigation and analysis of the Senior Credit Facilities or the transactions contemplated thereby and the creditworthiness of the [Borrowers].** The Recipient represents that it is sophisticated and experienced in extending credit to entities similar to the [Borrowers]. **The information and data contained herein are not a substitute for the Recipient's independent evaluation and analysis** and should not be considered as a recommendation by [Regions] or any of its affiliates that any Recipient enters into the Senior Credit Facilities.

(emphasis added)

26.     Additionally, on August 30, 2012, Comerica Bank sent a letter to Regions Bank in

connection with an appraisal of the Borrowers' collateral.  In that letter, Comerica Bank promised

that:

> [Comerica Bank has] **conducted [its] own independent investigation of the proposed collateral and not in reliance on Regions Bank or its affiliates, or any material or information provided to [Comerica] by [Regions] or any of [Region's] affiliates** which, if so furnished, is hereby acknowledged by [Comerica] to have been for information purposes only and **without representation or warranty . . . .**

(emphasis added).

27.     Indeed, Comerica Bank in fact sought out additional information that it considered

relevant to its independent evaluation of the Borrowers. For example, Comerica Bank requested and

received: (i) Color Star's mid-year balance sheets and income statements for June 30, 2011 and June

30, 2012; (ii) credit checks regarding the individual guarantors; (iii) the guarantors' personal financial

statements and tax returns; and (iv) a history of Color Star's inventory adjustments from 2008-2011.

Critically, on or about September 28, 2012, Comerica Bank requested—and received—a detailed

"explanation" from the Borrowers for how they calculated and adjusted the value of their then-current inventory. Only later did it become apparent that the Borrowers' explanation and statements were materially false.

28.     Comerica Bank representatives also independently visited Borrowers and their facilities. On September 17, 2012, Regions Bank arranged a site visit for Comerica Bank's Chief Credit Officer (Brian Foley) and Division Executive (David Terry). Comerica Bank was pleased with the access this trip had afforded them. The next day a Comerica Bank employee emailed that, "both [] executives were impressed with management." The same day, Comerica Bank Division Executive David Terry directly wrote to the Borrowers that, "[y]ou guys have a great story. We were impressed…."

29.     In early October, Regions Bank forwarded to Comerica Bank a field examination report that noted the examiner's uncertainties about Borrowers' inventory value due to Borrowers' failure to supply updated inventory figures. In part to better understand the inventory issue, Comerica Bank asked Regions Bank to facilitate a meeting with Borrowers' outgoing lenders at Bank of the West. On October 11, 2012, Comerica Bank told Regions Bank and Borrowers that Comerica Bank had delayed presenting the proposed loan to Comerica Bank's internal evaluation committee because of Comerica Bank's outstanding concerns about the inventory issues.

30.     However, Comerica Bank reversed course the next day after participating in the conference call with Bank of the West, which Comerica Bank had requested. On October 12, 2012, Comerica Bank, Regions Bank, and Bank of the West participated in a conference call during which Comerica Bank asked questions of Bank of the West. At the call's conclusion, Comerica Bank emailed Regions Bank that the meeting with Bank of the West had satisfied Comerica Bank's concerns. Specifically, Comerica stated:

> **Thanks very much for setting up the call. It made all the difference.** I think we are good to go. I'll be in the office this weekend supplementing the approval package

and making it as polished as possible, so if any questions come up I'll shoot you an email and we can address them on Monday. Thanks.

31.     Just four days later, on October 16, 2012—which was Comerica Bank's next opportunity to obtain review of the proposed loan from its internal review committee—Comerica sent a formal commitment letter to Regions Bank, stating that it was "pleased to commit up to $17,500,000 to the Senior Secured Credit Facilities." Even then, the October 16, 2012, commitment letter contained yet another disclaimer of non-reliance. Comerica stated:

> Our decision to issue our commitment is based on our independent investigation of the financial condition, creditworthiness, affairs, and status of Company, as we have deemed appropriate **and not in reliance on you or your affiliates, or any material or information provided to us by you or any of your affiliates,** which, if so furnished, is hereby acknowledged by us to have been for informational purposes only and without representation or warranty by you or your affiliates.

(emphasis added). Comerica Bank then went on to disclaim any obligation by Regions Bank to furnish additional information to Comerica Bank, even if Regions Bank later received such information, stating:

> We acknowledge that **you have no duty or responsibility** either initially or on a continuing basis, to provide us with any credit or other information with respect to the Company, whether such information came into your possession before we issued our commitment **or at any time thereafter**.

(emphasis added)

### *November 15, 2012: Comerica Executes the Credit Agreement and Again Disclaims all Reliance on Regions Bank.*

32.     On November 15, 2012, Regions Bank and Comerica Bank entered into a Credit Agreement and other supporting agreements to lend a total of $52.5 million to Borrowers. The Credit Agreement, together with its exhibits, is incorporated herein by reference, and attached as **Exhibit A** hereto. Regions Bank and Comerica Bank funded the loan and fully performed their respective obligations thereunder. Borrowers, by contrast, made numerous misrepresentations in the

Credit Agreement regarding their financial condition and the truth of the financial information they had provided to the lenders.

33.     The Credit Agreement states that it shall be governed by, and construed in accordance with, the law of the State of Texas. Texas law gives strict effect to disclaimers of reliance—especially ones made between sophisticated commercial parties such as Regions Bank and Comerica Bank. Because reliance is a necessary element of any fraud or concealment claim Comerica Bank might assert against Regions Bank, the disclaimer of reliance bars all of those claims.

34.     In Section 9.03 of the Credit Agreement, Comerica Bank agreed that Regions Bank did not owe any duty to Comerica Bank as a fiduciary or common-law agent other than those duties specifically enumerated in the Credit Agreement. In particular, Comerica Bank agreed that Regions Bank, acting as Administrative Agent for the syndicate, "shall not . . . have any duty to disclose and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates" that might be communicated to or obtained by Regions Bank. Specifically, Comerica Bank agreed:

> 9.03    <u>Exculpatory Provisions</u>. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:
>
> (a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing . . . .
>
> (c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity. . . . .
>
> The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence

of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

35.     Likewise, in Section 9.07, Comerica Bank explicitly agreed that it had not relied on any information from Regions Bank in deciding whether to enter into the Credit Agreement:

> 9.07     Non-Reliance on Administrative Agent and Other Lenders. Each Lender and (sic) acknowledges that it has, **independently and without reliance upon the Administrative Agent or any other Lender** or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, **independently and without reliance upon the Administrative Agent or any other Lender** or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(emphasis added).

36.     Even more specifically, Comerica Bank agreed in Section 4.01 that its execution of the Credit Agreement constituted its agreement with, and consent to the satisfaction of, all conditions precedent to closing—which included the Borrowers' requirement to deliver audited financial statements for 2011.[2]  By operation of Section 4.01:

> … [F]or purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement **shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder** to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

---

[2] Section 4.01(a)(xi) of the Credit Agreement established, as a condition precedent, Borrowers' duty to tender a satisfactory audited financial statement for 2011.

(emphasis added). Comerica Bank did not provide any notice of objection to Regions Bank, either in its own capacity or acting as Administrative Agent prior to the Closing Date, or at any time thereafter.

37.     Further, Comerica Bank disclaimed any liability by Regions Bank for relying on representations made by the Borrowers concerning the satisfaction of any condition precedent or other statement, absent notice to the contrary from Comerica Bank. Specifically, Comerica Bank agreed that:

> 9.04 <u>Reliance By Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon any notice, request, certificate, consent, statement, instrument, document, or other writing, (including any electronic message, Internet or intranet website posting, or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. **In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.** The Administrative Agent may consult with legal counsel (who may be counsel for any Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(emphasis added).

38.     In section 10.10, Comerica Bank agreed to the supremacy of the Credit Agreement and, in particular, that that "[t]his Agreement, the other Loan Documents and any separate letter agreement with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof."

39.     Nor did Regions Bank owe any extra-contractual duties to Comerica in addition to those enumerated in the Credit Agreement. In section 10.16, Comerica agreed that Regions was not

acting as an "advisor, agent, or fiduciary" for Comerica, and that Regions does not have "any obligation [to Comerica] with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents" (emphasis added). Stated more fully, Comerica agreed that:

> 10.16   No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrowers and the other Loan Parties acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i)(A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Arranger, are arm's-length commercial transactions between the Borrowers, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand, (B) each of the Borrowers and each other Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrowers and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii)(A) the Administrative Agent and the Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, each other Loan Party or any of their respective Affiliates, or any other Person and (B) **neither the Administrative Agent nor the Arranger has any obligation to the Borrowers, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents**; and (iii) the Administrative Agent and the Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, each Loan Party and their respective Affiliates, and neither the Administrative Agent nor the Arranger has any obligation to disclose any of such interests to the Borrowers, any other Loan Party or any of their respective Affiliates. **To the fullest extent permitted by law, each of the Borrowers and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby**.

40.     With respect to information placed into the Debtdomain database, Comerica once again confirmed in the Credit Agreement that it had accepted all of that information in an "as is" condition, without reliance on Regions Bank for the accuracy or completeness of that information.

Section 10.02(c) addressed the information provided online to Comerica and other lenders, and

stated that:

> THE PLATFORM[3] IS PROVIDED "AS IS" AND "AS AVAILABLE."
> [REGIONS DOES] NOT WARRANT THE ACCURACY OR COMPLETENESS
> OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE
> PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR
> OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF
> ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY
> WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR
> PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR
> FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY
> ANY AGENT PARTY IN CONNECTION WITH THE BORROWER
> MATERIALS OR THE PLATFORM.

(capitalization in original).

41.     Finally, section 10.20 disclaimed the existence of any other oral agreement among

Comerica Bank and Regions Bank.

> ENTIRE AGREEMENT: THIS AGREEMENT AND THE OTHER LOAN
> DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE
> PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR,
> CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE
> PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG
> THE PARTIES.

(capitalization in original).

### *Borrowers Default Soon after Closing the Loan Transaction.*

42.     Several months after closing, Borrowers began to disclose aspects of the truth about

their financial condition. In or around late April 2013, Borrowers delivered their interim March 2013

financial statement to Regions Bank, acting as Administrative Agent, as the Credit Agreement

required them to do. At about the same time, Borrowers also sent to Regions Bank a narrative

analysis and explanation titled "Financial Update as of March 31, 2013." In the "Financial Update,"

Borrowers informed Regions Bank that Borrowers' new accounting firm (not the prior Accountants)

---

[3] Section 6.02(j) described the "Platform," stating: "The Borrowers hereby acknowledge that the Administrative Agent and/or the Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively 'Borrower Materials') by posting the Borrower Materials on IntraLinks or another similar electronic system (the 'Platform')."

had performed an audit and inventory reconciliation of Borrowers' books, and concluded that a "monumental" write-down in inventory was required.

43.     Based on the actual inventory amounts determined by Borrowers' new auditors—rather than the inflated amounts Borrowers had represented to Regions Bank and Comerica Bank—Borrowers had actually defaulted on particular covenants of the Credit Agreement immediately upon closing the loan transaction, and continued to be in default.

44.     In addition, Borrowers failed to make principal and interest payments on the term portions of loans for the months of September, October, November, and December 2012. Borrowers also failed to make interest payments on the revolving portion of the loans for the months of September, October, November, and December 2012.

**THE BANKRUPTCY COURT ADJUDICATES REGIONS BANK'S AND COMERICA BANK'S RESPECTIVE CLAIMS.**

45.     Ultimately, on December 15, 2013, Borrowers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. The Bankruptcy Court later ordered the joint administration of Borrowers' bankruptcy cases and, on January 14, 2014, the Court entered sale orders. Pursuant to those orders, Borrowers sold substantially all of their assets and ceased conducting operations. Despite collecting some of the sale receipts, both Regions Bank and Comerica Bank lost tens of millions on their loans.

46.     During the bankruptcy cases, Regions Bank and Comerica Bank, among others, sought to maximize recovery on their losses incurred by funding the term loan and revolving loan components of the Borrowers' debt facility. Both banks actively participated in the bankruptcy cases, and they both obtained orders from the Bankruptcy Court allowing their respective claims.

47.     Importantly, Comerica Bank never objected to the value or propriety of Regions Bank's claim in bankruptcy. Had Comerica Bank wished, it could have argued that Regions Bank owed duties and damages to Comerica Bank such that Regions Bank's allowed claim might have

been smaller, or even subordinated to Comerica Bank's claim. The allegations upon which Comerica Bank has repeatedly threatened claims against Regions Bank—those that form the factual basis for this declaratory judgment case—arise out of the same nucleus of operative facts as do the claim allowances at issue in the Bankruptcy Court, *i.e.* the consummation and funding of the Credit Agreement.

48.     Comerica Bank voluntarily elected not to raise these issues before the Bankruptcy Court, however. On information and belief, Comerica Bank feared that inter-creditor disputes would have reduced or delayed both banks' abilities to recover proceeds from the bankruptcy sales.

49.     Thus, without objection from Comerica Bank, the Bankruptcy Court entered a number of final judgments involving both Regions Bank and Comerica Bank. For example, on January 14, 2014, the Bankruptcy Court entered orders directing the delivery of sale proceeds from substantially all of the Debtors' business assets to Regions Bank and Comerica Bank (the "Sale Orders"), attached as **Exhibit B**.  The Sale Orders recognized the validity of Regions Bank's and Comerica Bank's respective claims, but—for a  time—acknowledged other parties' rights to later object to the extent and validity of Regions' and Comerica's liens.

50.     On July 22, 2014, the Borrowers and the Official Committee of Unsecured Creditors (the "Committee") relinquished those objection rights when the Bankruptcy Court entered an order pursuant to Bankruptcy Rule 9019 approving a compromise of controversies between the Debtors, the Committee, Regions Bank, Comerica Bank, and the junior lender ("9019 Order"), attached as **Exhibit C**.

51.     The 9019 Order resolved controversies between the aforementioned parties with regard to, among other things: (i) the allowance of Regions Bank's and Comerica Bank's claims; (ii) the release of any claims the Debtors or Committee might have against Regions Bank and Comerica Bank; and (iii) a proposed plan for liquidation of the Debtors' remaining intangible assets, such as

commercial tort claims and avoidance actions. The Bankruptcy Court entered the 9019 Order after giving all parties, including Comerica Bank, an opportunity to object as well as a hearing on the merits of the proposed settlement.

52.     The Bankruptcy Court has also ruled from the bench confirming the Debtors' liquidating plan of reorganization (the "Confirmation Order").[4]  The Confirmation Order recognizes an opt-in release by which individual creditors, including Comerica Bank, released all claims against Regions Bank in exchange for the right to participate in recoveries from a Litigation Trust established by the Liquidation Plan to prosecute the Debtors' commercial tort claims. Comerica Bank agreed to vote in favor of the Debtors' plan.

53.     As the Fifth Circuit has routinely held, the Bankruptcy Court orders described above function as *res judicata* as to any inter-creditor claim like those Comerica Bank now threatens to assert against Regions Bank. Having elected not to bring its objections in the Bankruptcy Court, Comerica Bank may not now attack that Bankruptcy Court's orders through independent litigation against Regions Bank.

**COMERICA BANK REPEATEDLY THREATENS TO SUE REGIONS BANK**

54.     On February 13, 2013, Regions Bank filed suit in the 14th District Court of Dallas County, Texas against Borrowers, the Financial Advisor, the Accountants, and others, (collectively, the "Fraud Defendants") asserting claims for fraud and fraudulent misrepresentation; conspiracy to defraud; aiding and abetting fraud; and negligent misrepresentation and negligence per se.

55.     Before and after Regions Bank filed suit, it communicated multiple times with Comerica Bank to seek Comerica Bank's cooperation in the litigation. During those communications, Comerica Bank threatened to sue Regions Bank for allegedly failing to inform Comerica Bank about "red flags" concerning Borrowers. Comerica Bank has also threatened to sue

---

[4] Regions Bank anticipates that the Court will enter a written order very soon.

Regions Bank for failing to inform Comerica Bank that Borrowers had not met certain conditions precedent related to their audited financial statements for 2011. Despite Regions Bank's repeated requests, Comerica Bank has never explained why the many disclaimers of reliance in the Credit Agreement and other loan documents, are ineffective.

56.     On September 26, 2014, Comerica Bank filed an original petition in intervention against the Fraud Defendants in the 101st District Court for the State of Texas. Comerica Bank did not name Regions Bank as a defendant, but in later communications, Comerica Bank once again threatened to sue Regions Bank.

57.     Comerica Bank's threatened claims lack substantive merit, as evidenced by its longstanding and continuing reluctance to assert them. However, Regions now desires confirmation of its rights so that it may bring an orderly end to Comerica Bank's sabre-rattling.

58.     Accordingly, Regions Bank files this Original Complaint for Declaratory Judgment, and asks this Court to declare that (a) Comerica Bank's disclaimers of reliance bar any claims against Regions Bank for losses Comerica Bank incurred through funding loans to Borrowers, and (b) the Bankruptcy Court's orders bar Comerica Bank's claims as *res judicata*.

## CLAIMS

### COUNT ONE:  DECLARATORY JUDGMENT (CONTRACTUAL PROVISIONS)

59.     Regions Bank repeats and re-alleges every allegation made above, and incorporates them in this Count One.

60.     Regions Bank asks this Court to enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 USC §§ 2201–2202. Regions Bank seeks a declaration that the Credit Agreement bars any claims that Comerica Bank intends to bring or may bring against Regions Bank arising out of Comerica Bank's entry into the Credit Agreement or losses it sustained thereby.

61.     Resolution of the validity and enforceability of the Credit Agreement would serve a useful purpose in clarifying and settling any liability owed by Regions Bank to Comerica Bank. It would also provide relief to both Regions Bank and Comerica Bank from the uncertainty, insecurity, and controversy involving the parties' rights under the Credit Agreement and other loan documents.

62.     Comerica Bank's expressed intent to sue Regions Bank demonstrates an actual, substantial, case or controversy between parties with adverse legal interests and is of sufficient immediacy and reality to warrant declaratory relief.

63.     The plain language of the Credit Agreement demonstrates that Comerica Bank has released and waived all claims against Regions Bank arising out of Comerica Bank's entry into the Credit Agreement and any losses sustained thereby. This Court's early resolution of this issue would save all the parties time and expense, and would eliminate unnecessary further litigation either in this Court or elsewhere.

## COUNT TWO:  DECLARATORY JUDGMENT (*RES JUDICATA*)

64.     Regions Bank repeats and re-alleges every allegation made above, and incorporates them in this Count Two.

65.     Regions Bank asks this Court to enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 USC §§ 2201–2202. Regions Bank seeks a declaration of the *res judicata*, collateral estoppel, or other preclusive effect that the Bankruptcy Court's orders in connection with the Borrowers' bankruptcy cases have on Comerica Bank's threatened claims against Regions Bank.

## PRAYER

For these reasons, Regions Bank asks that the Court enter a declaratory judgment, ruling that:

a.      The Credit Agreement is valid and enforceable as to Comerica Bank;

b.    Specifically, the following release, waiver, integration, non-disclosure, disclaimer, disclaimer of advisory and fiduciary responsibility, disclaimer of reliance, and entire agreement language in sections 4.01, 9.03, 9.04, 9.07, 10.02(c), 10.10, 10.16, and 10.20 of the Credit Agreement are valid and enforceable as to Comerica Bank;

c.    The Credit Agreement releases, waives, bars, precludes and otherwise prevents Comerica Bank from asserting any claims or causes of action under state or federal law against Regions Bank based on any representations, omissions, or conduct by Regions Bank prior to Comerica Bank's entry into the Credit Agreement or any losses sustained thereby; and

d.    The Bankruptcy Court Sale Orders and 9019 Order bar Comerica Bank, as a matter of *res judicata,* collateral estoppel, or other doctrine of preclusion, from asserting claims against Regions Bank for damages arising out of Comerica Bank's entry into the Credit Agreement or losses it sustained thereby.

Regions Bank also asks the Court for any further relief to which it may be justly entitled.

Respectfully submitted,

**Vanacour Schuler Zarin PLLC**

By:  /s/ Kevin P. Perkins
      Kevin P. Perkins
      Texas State Bar No. 24053420
      kperkins@vszlaw.com
      14675 Midway Road Suite 100
      Addison, Texas 75001
      Phone: (972) 646-3999
      Fax:    (972) 692-0509

**Maynard Cooper & Gale, PC**

By:  s/Peter S. Fruin
      Peter S. Fruin
      Texas State Bar No. 24062562
      pfruin@maynardcooper.com
      1901 Sixth Avenue North
      Suite 2400 Regions/Harbert Plaza
      Birmingham, AL  35203
      Phone:  (205) 254-1000
      Fax:    (205) 254-9999

*Attorneys for Plaintiff Regions Bank*